**No. 25-6061**

---

**In The United States Court Of Appeals For The Tenth Circuit**

_____

JUAN A. DOMINGUEZ
PLAINTIFF/APPELLANT,

***v.***

WEISER SECURITY SERVICES, INC.
DEFENDANT/APPELLEE.

_____

ON APPEAL FROM
THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

THE HONORABLE SCOTT L. PALK
UNITED STATES DISTRICT JUDGE

Case No. CIV-2021-653-SLP

---

APPELLEE'S BRIEF

---

NATHAN L. WHATLEY
McAfee & Taft A Professional Corporation
Eighth Floor, Two Leadership Square
211 North Robinson
Oklahoma City, OK 73102
Telephone (405) 552-2365
**Attorney for Appellee**

**Oral Argument Not Requested**

## TABLE OF CONTENTS

I.  **STATEMENT OF ISSUE PRESENTED FOR REVIEW** ........................1

II. **STATEMENT OF THE CASE AND FACTS** ...................................1

    A.    Weiser's Statement of the Case .................................................................1

    B.    Weiser's Statement of Facts ...................................................................2

    C.    Response to Dominguez's Statement of Facts and
    D.    Dominguez's Dispute of the Undisputed Material Facts ........................16

        **a.**    Dominguez's Admissions Destroy His Case. ..........................17

        **b.**    Dominguez's Additional Facts Are
            Immaterial or Demonstrably False ...........................................22

III. **SUMMARY OF THE ARGUMENT** ........................................................ 26

IV. **STANDARD OF REVIEW** .......................................................................26

V.  **ARGUMENTS AND AUTHORITIES** ..................................................29

    A.    **THE EVIDENCE IN THE RECORD IS INSUFFICIENT TO
        SHOW CAUSATION AND PROVIDES NO BASIS FOR
        REVERSING THE DISTRICT COURT**. ..................................30

        **i.**    Strickland, the decisionmaker, had no knowledge
            of Dominguez's protected activity. ..........................................30

        **ii.**    Yates had no knowledge of Dominguez's protected
            activity. ....................................................................................34

        **iii.**    The speculation that Yates knew of Dominguez's
            protected activity and shared that knowledge
            with Strickland is insufficient to reverse
            summary judgment. ..................................................................35

        **iv.**    Dominguez's "actual knowledge" argument is a thinly
            veiled ploy to improperly introduce legal theories he

ii

has waived. ................................................................................38

    **B.**    **THE DISTRICT COURT'S CAUSATION ANALYSIS WAS NOT ERRONEOUS.** ...............................................41

        **i.**  The District Court properly applied the standard for summary judgment. ...........................................41

        **ii.**  The District Court properly declined to address Dominguez's evidence of pretext. ............................46

    **C.**    **DOMINGUEZ'S CAT'S PAW THEORY FAILS.** ......................48

        i.  The District Court properly concluded that there can be no cat's paw theory without evidence that Yates knew of Dominguez's protected activity. .........................................49

        ii.  The record shows that Yates did not proximately cause Dominguez's termination. ............................51

  **VI.**    **REQUEST FOR RELIEF** .........................................................53

  **VII.**  **STATEMENT REGARDING ORAL ARGUMENT** .............................53

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adamson v. Multi Cmty. Diversified Servs., Inc.*,
  514 F.3d 1136 (10th Cir. 2008) ....................................................................47, 48

*Anderson v. Phillips Petroleum Co.*,
  861 F.2d 631 (10th Cir. 1988) .............................................................................36

*Armstrong v. The Arcanum Grp., Inc.*,
  897 F.3d 1283 (10th Cir. 2018) ...........................................................................36

*Davis v. Simon Prop. Grp.*,
  9 F.App'x 876 (10th Cir. 2001) ...........................................................................41

*Davis v. Unified Sch. Dist. 500*,
  750 F.3d 1168 (10th Cir. 2014) ...........................................................................33

*E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles*,
  450 F.3d 476 (10th Cir. 2006) .............................................................................51

*Enstrom v. Beech Aircraft Corp.*,
  712 F. Supp. 841 (D. Kan. 1989).........................................................................36

*Fischer v. Forestwood Company, Inc.*,
  525 F.3d 972 (10th Cir. 2008) .............................................................................29

*Gordon v. New York Bd of Educ.*,
  232 F.3d 111 (2d Cir. 2000) ................................................................................33

*Heffernan v. City of Paterson, N.J.*,
  578 U.S. 266 (2016)..............................................................................................39

*Henderson v. FedEx Express*,
  442 Fed. Appx. 502 (11th Cir. 2011) (unpublished) ..........................................32

*Iweha v. State of Kansas*,
  121 F.4th 1208 (10th Cir. 2024) ..........................................................................53

*Kendrick v. Penske Transp. Servs., Inc.*,
  220 F.3d 1220 (10th Cir. 2000) ...........................................................................52

*Laul v. Los Alamos Nat'l Lab'ys*,
     765 F. App'x 434 (10th Cir. 2019)........................................................................30

*Lee v. Kansas City S. Ry. Co.*,
     574 F.3d 253 (5th Cir. 2009) ...............................................................................38

*Lindsay v. Denver Public Schools*,
     88 F.4th 1323 (10th Cir. 2023) .......................................................................37, 44

*Lobato v. New Mexico Env't Dep't*,
     733 F.3d 1283 (10th Cir. 2013) ............................................................................52

*Martin v. Fin. Asset Mgmt. Sys., Inc.*,
     959 F.3d 1048 (11th Cir. 2020) ............................................................................37

*Mauldin v. Driscoll*,
     136 F.4th 984 (10th Cir. 2025) ............................................................................32

*McDonnell Douglas Corp. v. Green*,
     411 U.S. 792 (1973)...........................................................................29, 33, 46

*Nealis v. CoxCom, LLC*,
     *731 F. App'x 787 (10th Cir. 2018)* ................................................................46, 47

*Petersen v. Utah Dep't of Corr.*,
     301 F.3d 1182 (10th Cir. 2002) ............................................................................30

*Poff v. Oklahoma ex rel. Dep't of Hum. Servs.*,
     No. CIV-15-936-R, 2017 WL 5618613 (W.D. Okla. Nov. 20,
     2017) .....................................................................................................................30

*Reich v. Hoy Shoe Co., Inc.*,
     32 F.3d 361 (8th Cir. 1994) ..................................................................................39

*Riggs v. AirTran Airways, Inc.*,
     497 F.3d 1108 Cir. 2007 .......................................................................................53

*Rivera v. City & Cnty. of Denver*,
     365 F.3d 912 (10th Cir. 2004) ..............................................................................41

*Selenke v. Med. Imaging of Colo.*,
     248 F. 3d 1249 (10th Cir. 2001) ...........................................................................29

v

*Simmons v. Sykes Enterprises, Inc.*,
   647 F.3d 943 (10th Cir. 2011) ...............................................................30

*Singh v. Cordle*,
   936 F.3d at 1041 ...................................................................33, 49, 51, 52

*Singleton v. Wulff*,
   428 U.S. 106 (1976)..............................................................................32

*Thompson v. Little am. Hotel Co.*,
   No. 22-4006, 2022 WL 10832885 (10th Cir. Oct. 19, 2022)............................52

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
   570 U.S. 338 (2013)..............................................................................29

*Ward v. Jewell*,
   772 F.3d 1199 (10th Cir. 2014) .........................................................38

*Wickman v. Henderson*,
   19 F. App'x 740 (10th Cir. 2001)........................................................37

## Other Authorities

Fed. R. App. P. 34(a)(1)...........................................................................53

# <u>CORPORATE DISCLOSURE STATEMENT</u>

Weiser Security Services, Inc. ("Weiser") is a privately held corporation. It does not have any parent corporations and there is no publicly held corporation or entity that holds 10% or more of Weiser's stock.

## <u>STATEMENT OF RELATED CASES</u>

(Tenth Circuit Rule 28.2(C)(1))

There are no prior or related appeals.

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| Weiser Security Services, Inc. | Weiser or Appellee |
| Juan Dominguez | Dominguez or Appellant |
| Mike Strickland | Strickland |
| Joseph Yates | Yates |
| Charlene Lee Sutherlin | Sutherlin |
| Chip Ford | Ford or the Client |
| Justin Chasteen | Chasteen |
| Robert Culberson | Culberson |
| United States District Court for the Western District of Oklahoma | District Court |
| Appendix | Appx. |

**APPELLEE'S BRIEF**

## I.    STATEMENT OF ISSUE PRESENTED FOR REVIEW

The sole issue presented in this appeal is whether the District Court correctly found Dominguez failed to establish the causation element of his *prima facie* case of retaliation.

## II.    STATEMENT OF THE CASE AND FACTS

### A.    Weiser's Statement of the Case

Pursuant to Fed. R. Appx. P. 28(b), Weiser submits the following Statement of the Case:

1.    Dominguez brought the underlying action, asserting claims of discrimination against his employer. (Appendix ("Appx.") at Vol. 1 at 006-009.) Specifically, Dominguez alleged retaliation for reporting and opposing sexual harassment and gender discrimination in violation of Title VII of the Civil Rights Act of 1964. (Appx. Vol. 1 at 006-009.) Dominguez's claims have no merit.

2.    Following discovery, Weiser filed a motion for summary judgment, asserting that Dominguez could not establish a triable issue of fact with respect to his claims. (Appx. Vol. I at 15-46.)

3.    On August 7, 2024, the District Court granted summary judgment to Weiser on all of Dominguez's claims. (Appx. Vol. III at 466-492.)

a. The District Court held that Dominguez "cannot establish the causation element of his prima facie case" of retaliation. (Appx. Vol. III at 482).

b. The District Court held that Dominguez failed to proffer sufficient evidence so that a factfinder could infer that either Strickland or Yates knew about Dominguez's complaint of discrimination. (Appx. Vol. III at 485).

c. The District Court held that "there is no evidence suggesting that Mr. Strickland harbored animosity toward Plaintiff." (Appx. Vol. III at 486).

d. The District Court held that Dominguez proffered "no evidence that Yates was motivated by retaliatory animus" as opposed to "something more benign, like mere dislike." (Appx. Vol. III at 492).

4. Following the District Court's grant of summary judgment to Weiser, this appeal followed.

**B.    Weiser's Statement of Facts**

As set forth in the briefing below, the issue at hand is whether Dominguez established a genuine issue of material fact in the District Court. The following facts correspond to the Undisputed Material Facts ("UMF") in Weiser's Motion for Summary Judgment. Appx. Vol. I. 020-031.

1. Weiser is a contract security company incorporated in the state of Louisiana. It provides security guard, remote monitoring, and other security services. In the fall of 2018, Weiser began providing security services to Halliburton on site at Halliburton's location in Duncan, Oklahoma. Appx. Vol. I at 047, Declaration of Mike Strickland ("Strickland Dec.") ¶ 3.

2. On October 31, 2018, Weiser hired Dominguez as supervisor, responsible for supervising day shift security officers. Appx. Vol. I at 058, Plaintiff's Deposition ("Pl. Dep.") 41:12-18.

3. Dominguez reported to Joseph Yates, the site manager. Appx. Vol. I at 060-061, Pl. Dep. 43:14-44:2. Yates reported to Mike Strickland, Branch Manager, who worked out of the Fort Worth, Texas location. Appx. Vol. I at 047, Strickland Dec. ¶ 3; Appx. Vol. I at 061, Pl. Dep. 44:17-22.

4. Halliburton employed a facility security manager, Chip Ford ("Ford" or "the Client."). Appx. Vol. I at 061, Pl. Dep. 44:4-11. Ford oversaw security services at the Duncan location for Halliburton. Halliburton expected that its rules, especially safety rules, would be followed by all Weiser personnel. Appx. Vol. I at 052-053, Pl. Dep. 28:21-29:2.

5. Part of Dominguez's job as a supervisor was to follow the client's procedures and keep the client satisfied with the services Weiser provided it. Appx. Vol. I at 052, Pl. Dep. 28:12-17. According to a training presentation that

3

Dominguez drafted himself, "[t]he goal is to be an effective team, to provide the best results to our company and our client." Appx. Vol. I at 056-057, Pl. Dep. 32:13-24; 33:7-23; Appx. Vol. I at 097-103, PowerPoint dated 1/28/20.

6.      Yates took a leave of absence for medical reasons beginning in late 2019, which continued into early 2020. Appx. Vol. I at 062, Pl. Dep. 47:2-11.

7.      According to a list of job duties that Dominguez himself prepared, Dominguez was responsible for a variety of medical and safety-related training for Weiser employees at the Duncan location, including First Aid, CPR, and AED training. Appx. Vol. I at 104-105, Plaintiff's Job Duties (listing "occasional training" "OJT training" and "First Aid / CPR/AED trainer" as his job duties); Appx. Vol. I at 054-056, Pl. Dep. 30:21-32:9 (testifying that he "was in charge of a lot of the training", that he trained officers at Duncan and other locations, and that "I was in charge of making the PowerPoints, I would stand up there and do the training;"); Appx. Vol. I at 060, Pl. Dep. 43:9-10 (testifying, "safety training, first aid, CPR/AED training, I was the only one who did that too"); Appx. Vol. I at 084, Pl. Dep. 127:6-14 (agreeing that he was "the go-to person for all types of medical training for the security team").

8.      Weiser's Anti-Discrimination/Harassment/Retaliation Policy prohibits "all forms of discrimination, harassment and retaliation." Appx. Vol. I at 106, Anti-Discrimination/Harassment/Retaliation Policy. The policy "prohibits any form of

4

retaliation against any employee… who reports potential violations of Weiser Security's… Anti- Discrimination/Harassment/Retaliation Policy." *Id*. The policy specifically provides that the company "will not tolerate harassment, retaliation, discrimination, or adverse action against any employee… who … [p]articipates or assists in an investigation…." *Id*. Dominguez received and acknowledged the handbook and testified that he was familiar with this policy. Appx. Vol. I at 064-065, Pl. Dep. 73:7-74:21.

9.   In October 2019, Dominguez met with Strickland and a Weiser VP, Robert Bullock. Dominguez now claims he reported Yates' favoritism of female employees during this meeting, but that Bullock and Strickland reacted positively to the report and told him they would try to take care of the issue. Appx. Vol. I at 067-068, Pl. Dep. 88:3-89:4; Appx. Vol. I at 069, Pl. Dep. 93:7-10. *See also* Appx. Vol. I at 106, Email dated 10/14/19 (Bullock email reporting that meeting was "very productive.").[1]

10.   According to Dominguez, when Yates returned from leave around January 2020, Dominguez was put in charge of employee relations issues instead of Yates. Appx. Vol. I at 066, Pl. Dep. 84:3-24.

---

[1] Dominguez is not alleging that this first report about Yates is the basis for his claim; his EEOC Charge states that the alleged retaliation occurred between June 1 and June 19, 2020, and his Complaint states that "On or around June 10, 2020, Plaintiff participated in protected activity." App. Vol. I at 007, Pl. Compl. ¶ 10.

11.　In February 2020, Dominguez was awarded with an "Officer of the Month" certificate for Weiser. Appx. Vol. I at 108, Officer of the Month Certificate. Strickland signed the award, and Yates presented it at a supervisor's meeting. Appx. Vol. I at 071, Pl. Dep. 98:8-11.

12.　Doing payroll was one of Dominguez's job duties. Appx. Vol. I at 104-105, Plaintiff's Job Duties; Appx. Vol. 1 at 059-060, Pl. Dep. 42:8-43:10.

13.　On June 4, 2020, Yates' contemporaneous notes show that Dominguez refused to perform payroll, claiming he was too busy. Appx. Vol. I at 109-112, Yates Notes dated 6/5/20. Dominguez claimed in his deposition that he did not remember this event. Appx. Vol. I at 082, Pl. Dep. 124:19-23.

14.　Weiser required all employees to wear masks due to the COVID-19 pandemic. Dominguez testified that he knew wearing a mask was mandatory. Appx. Vol. I at 075, Pl. Dep. 113: 24-25 ("We were mandated to wear these masks."); Appx. Vol. I at 083, Pl. Dep. 124:1-18.

15.　On Friday, June 5, 2020, around 12:15 p.m., Yates observed Dominguez not wearing a mask in the console. He reminded Dominguez to put his mask on. Appx. Vol. I at 109-112, Yates Notes dated 6/5/20 ("I tugged on my mask and reminded Lt. Dominguez not to forget his mask."); Appx. Vol. I at 072, Pl. Dep. 109:17-20; Appx. Vol. I at 073-074, Pl. Dep. 110:19-111:2 (Q: "Do you remember later that day talking with [Yates] and him telling you, reminding you that security

6

officers needed to wear masks while in the console? … A: "Yes, I do remember that, yes."); Appx. Vol. I at 093, Pl. Dep. 185:10-16 (Q: "Did Mr. Yates ever suggest to you that you had done anything wrong or inappropriate [on June 5]"? … A: "Whenever he came in and just told us that we needed to wear [a mask].") See also Appx. Vol. I at 113-115, Sutherlin Notes of Dominguez Interview (Dominguez admitting he "wasn't wearing it in console one day"); Appx. Vol. I at 116-117, Sutherlin Dec. ¶ 5.

16.   According to Yates' contemporaneous notes, Dominguez argued with the direction to put on a mask at the time, saying he would start wearing a mask on a future day. Appx. Vol. I at 109-112, Yates Notes dated 6/5/20; see also Appx. Vol. I at 074, Pl. Dep. 111:3-17 (Q: "[B]ut you did tell him that?" A: "That I wasn't going to wear one?" Q: "Yeah." A: "I told him I was going to wear one going forward."). Dominguez testified he did not remember if he put on a mask after the interaction. Appx. Vol. I at 075-076, Pl. Dep. 113:13-23 ("I don't fully recall"); 114:8-11. However, on June 10 he admitted to Weiser's VP of HR that he was not wearing a mask in the console one day when Yates and Ford came in. Appx. Vol. I at 113-115, Sutherlin Notes of Dominguez Interview; Appx. Vol. I at 116-117, Sutherlin Dec. ¶ 5.

17.   Later the same day, after being told to wear his mask in the console, Dominguez received a phone call from his wife who told him that her parents had

contracted COVID- 19, and Dominguez decided he needed to be tested for COVID-19. Appx. Vol. I at 077, Pl. Dep. 115:4-15.

18.    Dominguez told Yates that he would have to leave work for a personal matter in 30 minutes and did not tell him why or disclose any additional information. Appx. Vol. I at 109-112, Yates Notes dated 6/5/20; Appx. Vol. I at 078-079, Pl. Dep. 116:24-117:2 ("I just went and talked to Joseph and I said … I need to go home. Can I just go home for a personal matter? I didn't let him know [why].")

19.    After this conversation with Yates, Dominguez returned to the security console for a time before leaving work. Appx. Vol. I at 109-112, Yates Notes dated 6/5/20; Appx. Vol. I at 079-080, Pl. Dep. 117:11-14; 120:2-4.

20.    When Dominguez left work, he obtained a COVID-19 test. Appx. Vol. I at 076-078, Pl. Dep. 114:16- 22 ("I went ahead and got tested for COVID because [my wife] said that her parents got tested"); 115:1-2; 116:15-22 ("The reason why I wanted a test … Because my wife had called me that day and she was upset about – I really don't remember."). According to Yates' notes, Dominguez called Yates later that day and informed Yates that he (Dominguez) had been exposed to COVID-19, but had tested negative. Appx. Vol. I at 109-112, Yates Notes dated 6/5/20.[2]

---

[2] Dominguez testified that he did not remember the details of this conversation, but did not deny that it occurred. Appx. Vol. I at 080-081, Pl. Dep. 120:25-121:5 ("He told me that I better – honestly, I – I don't really remember a lot of that conversation that night. It's been so long.").

21.    According to Yates' notes, Yates' review of security camera footage showed that Dominguez had not been wearing a mask when he returned to the security console after Dominguez told Yates he needed to leave work, even after he knew that he had been potentially exposed to COVID-19, and after Yates had instructed him earlier that same day to wear a mask while in the security console. Appx. Vol. I at 109-112, Yates Notes dated 6/5/20. Dominguez testified that he did not remember if he put his mask on during this period. Appx. Vol. I at 079, Pl. Dep. 117:11-25.

22.    In early June 2020, Dominguez learned that Halliburton was implementing temperature checks for all employees and visitors entering the facility, beginning on June 15, 2020. Appx. Vol. I at 083, Pl. Dep. 126:2-18.

23.    Dominguez was responsible for training the security guards on how to conduct the temperature checks. Appx. Vol. I at 084, Pl. Dep. 127:9-14.[3]

24.    On June 8, a Monday, Yates instructed Chasteen and Dominguez regarding temperature checks, and briefly walked them through the process. Appx. Vol. I at 109-112, Yates Notes dated 6/5/20; Appx. Vol. I at 085, Pl. Dep. 129:3-20.

---

[3] Dominguez testified he did not remember the date he was told he needed to train the security guards on the temperature check process. Appx. Vol. I at 084, Pl. Dep. 127:15-21. Yates' contemporaneous notes put the date at June 4, 2020. See Appx. Vol. I at 109-112, Yates Notes dated 6/5/20.

25.    On June 10, Dominguez received an email from Ford, providing instructions and training materials for temperature checks. Appx. Vol. I at 119-142, Email from Ford dated 6/10/20 and Training Materials.

26.    On June 9 and 10, three officers informed Yates that they had not yet been trained on temperature checks. Appx. Vol. I at 146-147, Yates Notes dated 6/8/20.

27.    Yates then sent an email to Dominguez and other supervisors on June 10 reiterating that all security officers needed to be trained on temperature checks. Yates gave the supervisors until the end of the following day, June 11, to complete the required training. The email made clear that officers should "be able to perform a physical and verbal demonstration of the process" and would be "asked to walk through the temp check process by the client…". Appx. Vol. I at 143, Email from Yates dated 6/10/20.

28.    Yates also sent an email to Dominguez telling him that he needed to be at work at 4 a.m. on June 15 to assist with the first day of the temperature checks. Appx. Vol. I at 144-145, Email from Yates dated 6/10/20.

29.    Dominguez testified that in the evening of June 10, around the time Yates sent the above email, Yates called him and was upset because the training had not yet been completed, and informed him it needed to be completed the following day. Appx. Vol. I at 086, Pl. dep. 136:5- 19 ("He was just yelling at me in a rude

way and telling me that I needed to have all this training done. As soon as I get to work, that it has to be in his office with everybody's signature." Q: "So had it been turned in prior to that? I guess not?" A: "No." Q: "But that was the deadline that had been set up; right?" … A: "I don't remember the deadline.").

30.    As warned in the email, on Friday, June 12, Yates and the client conducted spot checks to make sure officers could walk through and demonstrate the process and were ready to begin performing the temperature checks on Monday. Appx. Vol. I at 146-147, Yates Notes regarding temperature training, 6/8/20 through 6/12/20; Appx. Vol. I at 087, Pl. Dep. 138:18-25.

31.    According to Dominguez's testimony, Yates told Dominguez about the spot checks and reported that the officers "all needed extra training." Id. Yates told Dominguez and Chasteen that the officers had not been correctly trained. Id. at 088, Pl. Dep. 141:5-9 (testifying, "he called us to his office and he just told us that we needed to retrain everybody"). Yates instructed Dominguez and Chasteen to go and complete training the officers. Id. at 141:5-18.

32.    Ford told Branch Manager Mike Strickland that he was unhappy with Weiser's level of readiness for the temperature check process, and that the officers had not been properly trained. Appx. Vol. I at 047, Strickland Dec. ¶ 3.

33.    Ford also told both Strickland and Charlene Lee-Sutherlin (Weiser's Vice President of Human Relations) that he was unhappy with Dominguez not

11

wearing a mask on June 5 after being told to do so and after having been exposed to COVID-19, as well as not having timely reported his COVID-19 exposure. Appx. Vol. I at 048, Strickland Dec. ¶ 8; Appx. Vol. I at 148, Sutherlin Notes of conversation with Ford.

34. On June 12, Yates reported to Strickland via email that he "sat down with [Dominguez] and went over the list of officers that weren't signed off and informed him that he needed to go back and make sure that all officers on his shift were capable of performing the duties for the temperature checks." Appx. Vol. I at 149-150, Yates Email "FW: Temperature Checks" dated 6/12/2020 at 3:11 p.m.

35. In order to ensure readiness for the new temperature check process on Monday, June 15, Strickland, Yates, and Ford all reported to the Halliburton Duncan location on Saturday, June 13, to complete the temperature check training that Dominguez had failed to complete. Appx. Vol. I at 048, Strickland Dec. ¶ 6; Appx. Vol. I at 091, Pl. Dep. 167:1-8 (admitting that training occurred on Saturday and that Halliburton took the temperature check training seriously).

36. Dominguez did not attend the training on Saturday, June 13. Appx. Vol. I at 048, Strickland Dec. ¶ 7.

37. Yates told Strickland that he had instructed Dominguez to be present on June 13 for the additional temperature check training. Appx. Vol. I at 048, Strickland Dec. ¶ 8.

12

38. During the training on Saturday, June 13, multiple officers told Strickland that Dominguez had dropped off the thermometers and a booklet, but had not actually trained them on how to perform temperature checks. Appx. Vol. I at 048, Strickland Dec. ¶ 7.

39. Ford told Strickland that he wanted Dominguez removed from the Halliburton contract for his failure to train the officers on temperature checks. Appx. Vol. I at 048, Strickland Dec. ¶ 9.

40. On April 27, 2020, a Black security officer named Robert "Jay" Culberson made a complaint to Weiser HR Employee Ashley Brown that he was being treated unfairly because he had not been moved to a primary console operator position. Appx. Vol. I at 152-153, Culberson 4/27/20 Email ("All I want is to be treated fairly"). On May 11, Culberson emailed Brown that he would like to make a formal complaint because he felt discriminated against due to his skin color. Appx. Vol. I at 151-152, Culberson 5/11/20 Email ("They treat everybody else better then me and I not afraid to see it. It's because of my skin color…. Come down here [and] talk to the employees.").

41. Weiser began investigating Culberson's complaints. Appx. Vol. I at 116, Sutherlin Dec. ¶ 4.

42. On June 10 and 11, 2020, Weiser's Vice President of Human Resources Charlene Lee-Sutherlin traveled to Duncan and conducted in-person interviews of

13

several employees as part of her investigation into Culberson's complaint. Appx. Vol. I at 116, Sutherlin Dec. ¶ 4.

43.    Dominguez spoke to Sutherlin on June 10, at 9:40 a.m. Ex. 9, Sutherlin Notes of Dominguez Interview. Appx. Vol. I at 117, Sutherlin Dec. ¶ 6.

44.    During his interview, Dominguez reported to Sutherlin that Yates favored female employees, especially employees that would flirt with Yates. Appx. Vol. I at 117, Sutherlin Dec. ¶ 6; Appx. Vol. I at 113-115, Sutherlin Notes of Dominguez Interview.

45.    However, most of the interview focused on investigating Culberson's complaint of not being given the primary console operator job. Appx. Vol. I at 117, Sutherlin Dec. ¶ 6; Appx. Vol. I at 113-115, Sutherlin Notes of Dominguez Interview.

46.    Dominguez never had another conversation with Sutherlin or anyone from HR, or attempted to do so. Appx. Vol. I at 089, Pl. Dep. 152:1-11.

47.    Dominguez did not tell anyone else what he told Sutherlin. *Id*. at 152:12-21.

48.    Sutherlin did not tell Yates what Dominguez had shared with her. Appx. Vol. I at 117, Sutherlin Dec. ¶ 7.

49.    Sutherlin did not tell Strickland what Dominguez had shared with her. Appx. Vol. I at 117, Sutherlin Dec. ¶¶ 7-8.

14

50.    After Dominguez failed to show up for the training on June 13, Strickland made the decision to terminate Dominguez's employment. Appx. Vol. I at 049, Strickland Dec. ¶¶ 11-13.

51.    Strickland terminated Dominguez's employment because the client wanted Dominguez removed from the post, Strickland believed that Dominguez had not completely and properly trained security officers on the temperature check process as instructed, and Strickland believed that Yates had instructed Dominguez to be present on June 13 and Dominguez had not shown up. *Id*. Strickland also believed Dominguez had not been wearing a mask as required, and did not notify Weiser of his COVID-19 exposure in a timely manner. *Id*. On top of these reasons, Strickland believed that Dominguez had been having recent performance problems, such as refusing to do payroll, which Yates had been documenting contemporaneously. See Appx. Vol. I at 154-156, Yates Notes of Dominguez's Performance Problems; Appx. Vol. I at 048, Strickland Dec. ¶ 10. Additionally, Dominguez had sent a security officer home without pay when she was less than five minutes late to work, contrary to Weiser's policy. Appx. Vol. I at 048, Strickland Dec. ¶ 10; Appx. Vol. I at 070, Pl. Dep. 95:4-10 (Dominguez testified, "I basically told her she needed to go home… she was like two minutes late. So I walked outside and I told her… you can just go ahead and go home for the day.").

15

52.    Strickland considered Dominguez's conduct as a whole to be gross inattention to duty as well as failure to follow safety rules. Appx. Vol. I at 049, Strickland Dec. ¶ 12.

53.    Weiser has a discipline policy, which provides that "complete disregard of safety rules," and "gross inattention to duty" are immediately terminable offenses. Appx. Vol. I at 167, Discipline Policy. See also Appx. Vol. I at 049, Strickland Dec. ¶ 12.

54.    At the time he made the termination decision, Strickland did not know what Dominguez had said to Sutherlin during his interview with her on June 10. Appx. Vol. I at 049, Strickland Dec. ¶ 14.

55.    Strickland's decision to terminate Dominguez was not connected to Dominguez's participation in the HR investigation of Culberson's complaint. Appx. Vol. I at 049, Strickland Dec. ¶ 15.

C.    **Response to Dominguez's Statement of Facts and Dominguez's Dispute of the Undisputed Material Facts[4]**

Weiser submits this combined response to Dominguez's Statement of Facts and Dominguez's Response to Weiser's Undisputed Material Facts. On summary judgment and now on appeal, Dominguez does not attempt to controvert many of

---

[4] The following corresponds to the Response to Plaintiff's Statement of Facts and Plaintiff's Dispute of the Undisputed Material Facts in Weiser's Reply in Support of Summary Judgment. Appx. Vol. III at 413-419.

the Undisputed Material Facts set forth in Weiser's opening brief. Further, Dominguez's Statement of Facts contains unauthenticated information, inadmissible hearsay, and arguments of counsel. The information provided by Dominguez does not refute the facts as stated by Weiser and it does not support a finding that the District Court erred in granting Weiser summary judgment.

### a. Dominguez's Admissions Destroy His Case.

Plaintiff admits most of Weiser's undisputed facts. Dominguez admits that retaliation for his report to Sutherlin is impossible because he admits that neither he nor Sutherlin told anyone of his alleged protected action. UF 40–49 (Appx. Vol. I at 028-030)[5] and 54–55 (Appx. Vol. I at 031). How Strickland could have retaliated against Dominguez for a report that Strickland did not know about is a logical hurdle that Dominguez never clears. Dominguez also admits the following: he was responsible for training and for keeping Halliburton happy; Weiser required him to train officers for the temperature check process in June 2020; he received instruction on doing so. UFs 5, 7, 23-25 (Appx. Vol. I at 021-022, 025-026). Dominguez admits

---

[5] Dominguez neither admits nor denies UFs 48 and 49 (Appx. Vol. I at 029-030), stating "this is what Sutherlin claims." Dominguez submits no evidence to controvert Sutherlin's firsthand testimony regarding with whom she shared information. Tellingly, Dominguez states that "Sutherlin, Ford and Dominguez" were aware of the investigation, Appx. Vol. II at 179, which proves nothing about Yates and Strickland's knowledge of Dominguez's specific comments.

the training he performed was so poor that Weiser scheduled an additional Saturday training session. UF 34, 35 (Appx. Vol. I at 027-028).

Although Dominguez purports to deny many of Weiser's UFs, closer review reveals no material disagreement. Regarding UFs 12 and 13 (Appx. Vol. I at 023), Dominguez denies that payroll was one of his job duties, despite stating the opposite in his self-prepared job description and in his deposition. Appx. Vol. I at 104-105; Appx. Vol. II at 212-213, Pl. Dep. 42:8-43:10. Dominguez does not deny he refused an assignment from his supervisor. UF 13 (Appx Vol. I at 023). Nor does Dominguez controvert Strickland's testimony that Strickland believed Dominguez had failed to do payroll as instructed. *See* Appx. Vol. I at 048, Strickland Dec. ¶ 10. Dominguez attaches a text message from March 2020 showing he did payroll then, which is irrelevant to his refusal in June.

UFs 14 through 21 (Appx. Vol. I at 023-025) relate to the incident on June 5, 2020, before his alleged protected action, when Dominguez got in trouble from his supervisor when he was caught mask-less in the console, even though he knew that he was supposed wear a mask at the time. These facts come from Dominguez himself. Appx. Vol. I at 093, Pl. Dep 185:10-16 (Q: "Did Mr. Yates ever suggest to you that you had done anything wrong or inappropriate [on June 5]"? … A: "Whenever he came in and just told us that we needed to wear [a mask]."). Weiser did have 100% masking in place beginning in April 2020. Appx. Vol. II at 359-361.

18

Dominguez repeatedly admitted to a mask mandate, including "in June of 2020." Appx. Vol. I at 073-082, Pl. Dep. 110:22-11:2; 113:24-25; 124:8-18. He also admitted to it on June 10, when he spoke to Sutherlin. Appx. Vol. I at 116-118. Chasteen's statement supports this as well. Appx. Vol. II at 326, Chasteen Dep. 16:3-7. ("Joseph was very adamant about having his mask on"). The email Dominguez cites to supposedly establish that the policy was not announced until June 8 was actually "specific to the entire area of the Halliburton facilities, even the common areas, which was a change." Appx. Vol. III at 432-433, Sutherlin Dep. 55-56. Sutherlin, who as the VP of Weiser HR has personal knowledge of the company's COVID-19 policies, testified that officers "were required to wear [a mask] in enclosed areas before that. And, you know, we – because we had disbursed masks to our employees, so I know previous to June 8th, they were required in certain areas within the facility." *Id.* Culberson's affidavit cannot overcome Dominguez's own admissions or Sutherlin's firsthand knowledge. Culberson was a night shift patrol officer then; he did not set COVID-19 policies. Culberson had already been advised to quarantine in May 2020 when he was awaiting test results. His affidavit claiming otherwise is false. Appx. Vol. II at 313-315.

Dominguez admits having been exposed to COVID-19, failing to inform Weiser of the exposure until after being tested, and failing to wear his mask in the close-quartered console. UF 18-21 (Appx. Vol. I at 024-025) and evidence cited

19

therein. Dominguez now claims he was not exposed to COVID-19 from his in-laws but rather a coworker, a change in his testimony. Appx. Vol. I at 076, Pl. Dep. 114:18-19 ("I got a call from my wife…I went ahead and got tested for COVID because [my wife] said that her parents got tested…."). The source of the exposure is immaterial. He also "doesn't remember" if he wore his mask or not before leaving to get tested, but does not refute that Strickland believed he had not done so. UF 21 (Appx. Vol. I at 025).

Regarding UF 26 (Appx. Vol. I at 026), Dominguez does not dispute that officers told Yates on June 9 and 10 that they had not yet been trained on temperature checks,[6] but Dominguez says he finished training these officers later. This point is immaterial, as Strickland's decision did not rely on these officer's statements but rather was based on his own observations of the lack of readiness. Dominguez also admits that, as of June 10, he had failed to turn in the paperwork to show he had completed the training. UF 29 (Appx. Vol. I at 026-027); Appx. Vol. I at 086, Pl. Dep. 136:5-19. Yates told Dominguez and Chasteen that officers had not been properly trained. UF 27, 29, 31 (Appx. Vol. I at 026-029), and evidence cited therein. The dissatisfaction with the job Dominguez (and Chasteen) were doing was genuine.

---

[6] Appx. Vol. II at 247, Pl. Dep. 132:6-11; s*ee also* Appx. Vol. II at 334 (Williams, admitting he told Yates that he did not have a full understanding of how to do the temperature checks). Weiser does not dispute that Dominguez may have continued Williams' training after Williams spoke to Yates.

Dominguez does not deny that Ford told Strickland that he was dissatisfied with the training, and Strickland's deposition offers additional support for these facts. UF 32-33 (Appx. Vol. I at 027); Appx. Vol. III at 453, Strickland Dep. 45:1-8; 58:4-22 ("Mr. Ford contacted me about his inspection of the officers and making sure they understood what to do, [and] he was not happy with the failures at all."). A customer's dissatisfaction is a legitimate reason for termination. Dominguez mostly admits UF 34 (Appx. Vol I at 027-028): that Yates informed Strickland that Dominguez was falling behind on training, and he had been given a final chance to "make sure that all officers on his shift were capable of performing the duties for the temperature checks." Appx. Vol. I at 149-150. Dominguez argues with himself, asserting that Yates was "lying" in his email to Strickland, even though the email matches Dominguez's own testimony: "Joseph called us in on Friday and told us to go ahead and train everybody again because they all needed extra training." Appx. Vol. I at 087, Pl. Dep. 138:23-25. Chasteen confirms this: "I was just told that we needed to make sure we trained – retrained the officers … because the client was unhappy and to make sure the temperature, the wellness checks were being done the way they needed to be." Appx. Vol. II at 327-328. There is no dispute.

Dominguez lumps UF 35–39 (Appx. Vol. I at 028) together and adds irrelevant information or objections but does not dispute that Strickland believed Dominguez was supposed to be at the training on Saturday, June 13, 2020. UF 37

21

(Appx. Vol. I at 028); Appx. Vol. III at 446, Strickland Dep. 28:2-6. Chasteen confirmed that he "was told we might would need to come in on the Saturday to do … further training with the officers on how to do the… temperature checks for Covid, as the client didn't see that they were being done correctly by all the officers." Appx. Vol. II at 319-320. Dominguez admits UF 40-41 (Appx. Vol. I at 028-029), but adds the false statement that "a guard reported Yates saying on June 11 … that Dominguez would be the next person to go." Culberson told Sutherlin on June 11 "that he *thought* that they…Yates and Ford, were trying to get rid of Mr. Dominguez" but no one reported Yates *saying* anything of this nature, on June 11 or otherwise. Appx. Vol. II at 307-308, Sutherlin Dep. 74:25-75:3. Dominguez purports to dispute Weiser UFs 50–55 (Appx. Vol. I at 030-031) which address Strickland's termination decision. Strickland confirmed these reasons in his deposition. Appx. Vol. III at 444-455, Strickland Dep. 20:4-23; 28:2-10; 40:19-23; 52:4-18. Dominguez did not know who made the termination decision and has no evidence to refute Strickland's testimony.

### b. Dominguez's Additional Facts Are Immaterial or Demonstrably False.

Dominguez adds 26 of his own facts. Weiser disputes parts of PF1 and 10. None of these disputes are material fact disputes. PF1 and subparts are speculation and misrepresentation, putting forward a conspiracy theory that Yates knew an investigation was taking place and imagined Dominguez might talk bad about him,

22

a supposition that Dominguez attempts to support with the "get aligned" conversation which occurred months or weeks *before* Dominguez's protected action. Yates has not testified in this matter, and "facts" about his thoughts are fabrications. PF1(A), (B), (C), and (D).

The Response is wrong that "Yates knew at least by June 4 that he was being investigated for gender discrimination and he attributed the investigation to Dominguez." PF(A). First, Yates "did not know any of the specifics of the complaint. … Ashley just told him there was a complaint and we would be investigating it." Appx. Vol. II at 299, Sutherlin Dep. 35:6-18. What Yates "attributed the investigation to" is unknown; he has not testified in this matter. Second, on June 4, Yates was *not* being investigated for gender discrimination. Culberson (not Dominguez) made a report of *race discrimination*. UF 40 (Appx. Vol. I at 029-029); Response at 6. Sutherlin did not testify otherwise, as the Response claims. She testified that on June 11 Culberson told her that Yates "had several favorites, both male and female.*"* Appx. Vol. III at 436-437, Sutherlin Dep. 72:23-73:2. Yates never said "I know you complained about me to Robert and Mike and we better get aligned." Appx. Vol. II at 183. The Response cites to Dominguez's deposition page 161, which merely says that Yates said "me and him had to get aligned, we had to start working together." Appx. Vol. I at 090-01, Pl. Dep. 161-162. Likewise, PF1(E) is false. *Dominguez*, not Culberson, reported on June 10 to

23

Sutherlin he had heard that Yates told Chasteen that Dominguez was "the next one out," as the deposition pages Dominguez cites shows. Appx. Vol. III at 429-431, Sutherlin Dep. 47-49 (Q: "And did you understand that that was the statement by *Mr. Dominguez…*"). Dominguez's own statement about Yates on June 10 *is* the alleged protected action and cannot be evidence that Yates retaliated against Dominguez *after*.

Dominguez claims he completed training Williams later, after having been interrupted while training initially. PF1(F). Even if Yates got it wrong about Williams, Strickland did not rely on the interrupted training of Williams for the termination decision. There is no evidence that Strickland made the decision to fire Dominguez based on any "false complaints of Yates." PF1(H).

PF 10 claims that Yates admitted to Dominguez he knew he was being investigated and admitted he favored women. This contains no citation to the record, because this never appears in the record. "[T]he non-movant must do more than refer to allegations of counsel contained in a brief to withstand summary judgment. Rather, sufficient evidence (pertinent to the material issue) must be identified by reference to an affidavit, a deposition transcript or a specific exhibit incorporated therein." *Thomas v. Wichita Coca-Cola Bottling Co.,* 968 F.2d 1022, 1024-25 (10th Cir. 1992).

24

Weiser admits PF1 G, I (in part), J, K, L, M, and PF 2-13, none of which preclude summary judgment. Fact G asserts there is no document from June 10 showing the instruction for Dominguez to come in on June 13. This is a red-herring. Such instructions were usually verbal, and the Saturday training was not necessary until June 12. Appx. Vol. III at 457-458, Statement of Langwell. Regarding PF1(I), Yates sent an email on June 18, 2020. Dominguez's characterization of this email as "false" is argument, not fact. Strickland did terminate Dominguez on June 19, 2020. PF1(J). The termination form says Dominguez was terminated for "continued performance issues," Appx. Vol. II at 373, a fair summary of the reasons for Strickland's termination decision. Facts K, L, and M are admitted but immaterial.

Regarding PF 2, Dominguez's opinion based on working with Yates that Yates could usually control terminations is irrelevant to the decision here, which Yates did not make. PF 3, 4, 5, 6, 7, 8, and 11 were contained in Weiser's Motion. PF 9 is immaterial; none of the reasons leading to Dominguez's termination involve Ms. Alvarez. PF 12 and 13 are admitted; PF 14 is a legal contention. Pretext is examined from the decisionmaker's viewpoint, so coworker's opinions about the sufficiency of Dominguez's training are irrelevant. *Rivera v. City & Cty. of Denver*, 365 F.3d 912, 924-25 (10th Cir. 2004).

## III.  SUMMARY OF THE ARGUMENT

The District Court properly granted summary judgment on Dominguez's retaliation claim under Title VII. Nothing that Dominguez argues on appeal warrants reversal. Dominguez's brief, like his arguments before the District Court, essentially asks this Court to adopt his narrative built exclusively on implication and insinuation. This is precisely the kind of speculation that cannot defeat summary judgment.

Quite simply, this case presents little more than an employee disagreeing with and second guessing an employer's legitimate business decision—his termination for performance issues—and labeling them as retaliatory. Defendant respectfully submits what should be self-evident: the decisionmaker, Strickland, cannot retaliate against Dominguez's protected activity of which Strickland had no knowledge. Nor can Yates, Dominguez's supervisor, have retaliatory animus toward Dominguez for his protected activity of which Yates had no knowledge. The District Court correctly found that Dominguez's utter failure to present evidence that would allow a factfinder to infer such knowledge of either Strickland or Yates is thus fatal to Dominguez's claim.

## IV.  STANDARD OF REVIEW

The Tenth Circuit "review[s] the district court's grant of summary judgment de novo, applying the same legal standard used by the district court." *Simms v.*

26

*Oklahoma ex rel. Dept. of Mental Health and Substance Abuse Services,* 165 F.3d 1321, 1326 (10th Cir.) (citation omitted), cert. denied, 528 U.S. 815, 120 S.Ct. 53, 145 L.Ed.2d 46 (1999). The Tenth Circuit "may affirm the district court's grant of summary judgment on any ground adequately supported by the record." *Mauerhan v. Wagner Corp.*, 649 F.3d 1180, 1184 (10th Cir. 2011), *citing Johnson v. Weld Cnty.*, 594 F.3d 1202, 1215 (10th Cir. 2010). Notably, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart,* 144 F.3d 664, 670 (10th Cir. 1998) (internal citations omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the

entry of summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

To avoid summary judgment, Plaintiff must do far "more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Rather, he "must present sufficient evidence in specific, factual form for a jury to return a verdict in [their] favor." *Bacchus Indus. Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir. 1991). In ruling on summary judgment, the Court should grant reasonable inferences in favor of the non-moving party, but the Court does not have to make "unreasonable inferences in favor of the non-moving party," *Llewellyn v. Allstate Home Loans, Inc*., 711 F.3d 1173, 1187 (10th Cir. 2013) (internal quotations omitted) or "adopt one party's version of the facts if the record doesn't support it." *Harte v. Comm'r*, 864 F.3d 1154, 1173 (10th Cir. 2017). An inference is unreasonable if it requires "'a degree of speculation and conjecture that renders [the factfinder's] findings a guess or mere possibility.'" *Pioneer Centres Holding Co. Employee Stock Ownership Plan & Tr. V. Alerus Fin., N.A*., 858 F.3d 1324, 1334 (10th Cir. 2017), *cert. dismissed sub nom. Pioneer Centres Holding v. Alerus Fin*., 139 S. Ct. 50, 201 L. Ed. 2d 1128 (2018) (citation omitted). The nonmoving party "must set forth evidence sufficient for a reasonable jury to return a verdict in [its] favor." *Id.* (citations omitted).

Under this standard, it is clear that Dominguez did not and could not meet that burden, and the District Court properly disposed of all his claims on summary judgment.

## V.     ARGUMENTS AND AUTHORITIES

To establish a *prima facie* case of retaliation, Dominguez must show (1) that he engaged in protected opposition to discrimination; (2) that his employer took an adverse employment action against him; and (3) that a causal connection exists between the protected activity and the adverse action. *Fischer v. Forestwood Company, Inc.*, 525 F.3d 972, 979 (10th Cir. 2008)). "[A] plaintiff making a retaliation claim … must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). If Dominguez establishes a *prima facie* case, the burden-shifting analytical framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), is used to evaluate retaliation claims. "[I]f the plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the employer to articulate a nondiscriminatory reason for the adverse employment action. If the employer satisfies this burden of production, then, in order to prevail on his retaliation claim, the plaintiff must prove that the employer's articulated reason for the adverse action is pretextual, *i.e.*, unworthy of belief.'" *Selenke v. Med. Imaging of Colo.*, 248 F. 3d 1249, 1264 (10th Cir. 2001) (internal quotation omitted).

29

In this case, the District Court found that Dominguez failed to carry his burden of establishing a *prima facie* case of retaliation, where Dominguez presented no evidence that would permit a factfinder to infer that either Strickland or Yates had knowledge of Dominguez's protected activity.

A. **THE EVIDENCE IN THE RECORD IS INSUFFICIENT TO SHOW CAUSATION AND PROVIDES NO BASIS FOR REVERSING THE DISTRICT COURT.**

   i.    **Strickland, the decisionmaker, had no knowledge of Dominguez's protected activity.**

Courts repeatedly hold that there is no causal connection when there is no evidence that decisionmakers knew of the protected conduct[7], or relied upon information from those without knowledge of the protected conduct. *See Laul v. Los Alamos Nat'l Lab'ys*, 765 F. App'x 434, 442 (10th Cir. 2019); *Simmons v. Sykes Enterprises, Inc.*, 647 F.3d 943, 949–50 (10th Cir. 2011); *Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002) ("An employer's action against an employee cannot be because of that employee's protected opposition unless the employer knows the employee has engaged in protected opposition."); *Poff v. Oklahoma ex rel. Dep't of Hum. Servs.*, No. CIV-15-936-R, 2017 WL 5618613, at

---

[7] It is not disputed that Plaintiff did make a report of alleged gender discrimination to Weiser's Human Resources Vice President, Charlene Sutherlin.

30

*3 (W.D. Okla. Nov. 20, 2017) (citing cases). Dominguez's retaliation claim fails because Strickland had no knowledge of Dominguez's complaint to Sutherlin.[8]

First, Dominguez's arguments for why Strickland allegedly knew are not persuasive. Dominguez argues that a jury could infer knowledge by Strickland of Dominguez's protected activity because Strickland knew that Dominguez was participating in an HR investigation for a complaint of racial discrimination alleged by another employee. Dominguez notes in his brief that the District Court "did not question these elements of knowledge"; that is because they are wholly irrelevant to Dominguez's retaliation claim. General awareness that Dominguez was interviewed as part of an internal investigation regarding another employee's complaint of racial discrimination is insufficient to show that Strickland had knowledge of Dominguez's *protected conduct*, i.e., his complaint of gender discrimination made to Sutherlin.

The record is clear that Strickland did not know the *substance* of Dominguez's statements, nor did he know that Dominguez had engaged in any *protected activity*

---

[8] Dominguez makes the perplexing argument in his brief that, because proof of knowledge is "peculiarly within the employer's information", Weiser is the party best situated to bear the burden of proof. App. Br. at 29. Dominguez first claimed knowledge was unnecessary to his *prima facie* case—which is undoubtedly wrong—and now seemingly attempts to relieve himself of the burden of proving his *prima facie* case. This is improper, and a last-ditch effort by Dominguez to salvage his claims when he has no evidence of knowledge by either Strickland or Yates.

himself.[9] Dominguez's brief concedes this point, stating that the claimed lack of knowledge was "solely as to what Mr. Dominguez said when he was interviewed." Appellant's Br. at 11. Specifically, Dominguez admits that "Strickland did not know what Dominguez had said to Sutherlin during his interview with her on June 10," and that "Sutherlin did not tell Yates [or Strickland] what Dominguez had shared with her." Appellant's Br. at 11-12. Importantly, it is the *statement* Dominguez made to Sutherlin about alleged gender discrimination that constitutes his protected activity, not the mere fact that he met with Sutherlin regarding another employee's complaint.[10] Accordingly, it is Strickland's lack of knowledge of the *statement* that is just one of the various reasons why Dominguez's retaliation claim fails. *See Henderson v. FedEx Express*, 442 Fed. Appx. 502, 507 (11th Cir. 2011) (unpublished) (finding that plaintiff failed to establish a causal link for purposes of his retaliation claim when the decisionmaker "knew that [plaintiff] was going to

---

[9] Accordingly, Dominguez's reliance on *Mauldin v. Driscoll*, 136 F.4th 984 (10th Cir. 2025), is misplaced, as the *Mauldin* decision involved a decisionmaker who was indeed aware of the plaintiff's protected activity.

[10] Further, to the extent that Dominguez is arguing that his meeting with Sutherlin constituted a protected activity—which Dominguez must do for Strickland's knowledge of his meeting to constitute knowledge for purposes of his *prima facie* case—he has waived that argument by improperly raising it for the first time on appeal. It is a well-established principle that arguments not raised below are waived on appeal. *See, e.g., Singleton v. Wulff*, 428 U.S. 106, 120 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below.")

32

speak with someone from human resources, [but] there was no evidence that [the decisionmaker] ever learned what was said at the meeting.").

Appellant's attempt to invoke the "corporate knowledge" doctrine, citing cases like *Gordon v. New York Bd of Educ.*, 232 F.3d 111 (2d Cir. 2000), is unavailing. These cases, which suggest that general corporate knowledge of protected activity may be sufficient, typically involve a plaintiff suing the entity itself (e.g., the "Board") where the collective knowledge of the organization, rather than specific individual agents, is at issue. Not only is this doctrine inapposite to the present case, but more significantly, this doctrine has been expressly rejected by this Court in the context of Title VII claims.

In *Singh v. Cordle*, 936 F.3d at 1041, the plaintiff argued that the concept of corporate liability should apply to his Title VII claim, thus permitting culpability even without proof that any decisionmaker acted with discriminatory intent. This Court reiterated the application of the *McDonnell Douglas* framework, stating that "general corporate knowledge" is inapplicable in this context. Rather, it is the intent of the decisionmaker—or the intent of the decisionmaker's biased subordinate under a cat's paw theory—that is essential. *Id*. at 1041; *see also Davis v. Unified Sch. Dist. 500*, 750 F.3d 1168 (10th Cir. 2014) ("There is no evidence of any [decisionmaker]'s knowledge of [the plaintiff's] protected activity and we see no reason to impute the HR Department's knowledge to any of them.").

Dominguez nonetheless argues that this concept of corporate knowledge, unrecognized by this Court in this context, paired with general awareness that Dominguez was interviewed as part of another employee's complaint "should be enough"—citing to no legal authority. App. Br. at 31. All the while, Dominguez concedes in his brief how "this Circuit requires more, to wit: a showing that the deciding officials possessed knowledge of the protected conduct." *Id*. Dominguez makes no such showing.

### ii.    Yates had no knowledge of Dominguez's protected activity.

Next, Dominguez argues that Yates had knowledge of Dominguez's protected activity, despite the undisputed fact that neither Dominguez nor Sutherlin told anyone about Dominguez's complaint. Dominguez claims that Yates made comments to him about knowing a gender discrimination claim had been made against him and knowing he was going to be investigated for that. Dominguez recounts this conversation as evidence that Yates knew Dominguez made a complaint to Sutherlin during his June 10 interview—even though, as the District Court properly noted, the cited deposition testimony is referencing this conversation as taking place before Dominguez's interview. Appx. Vol. III at 490. Since this encounter occurred *before* Dominguez engaged in a protected activity, it is perplexing how this could be evidence that Yates had knowledge of Dominguez's protected activity.

34

Dominguez further misrepresents a quote from Weiser's Reply in Support of its Motion for Summary Judgment—that "Yates 'did not know any of the specifics of the complaint'"—insinuating that Yates was somehow aware of Dominguez's gender discrimination complaint to Sutherlin, even if he did not know the "specifics." App. Br. at 27. The District Court properly clarified that Yates learned from Sutherlin that he was part of an investigation and a complaint in a general sense, which is insufficient for a factfinder to infer that she told him of Dominguez's gender discrimination allegation. Appx. Vol. III at 490. Yates' lack of knowledge regarding Dominguez's complaint is fatal to Dominguez's cat's paw theory.[11]

### iii. The speculation that Yates knew of Dominguez's protected activity and shared that knowledge with Strickland is insufficient to reverse summary judgment.

Not only does Dominguez argue that a jury could infer knowledge by Yates, which is unsupported by the record, he further argues that a jury could infer that Yates told Strickland about Dominguez's complaint based solely on the "close communication" regarding Dominguez between Yates and Strickland prior to Dominguez's termination. App. Br. at 29. But Dominguez proffers no evidence whatsoever that any communications between Yates and Strickland concerned

---

[11] Though this section of Weiser's argument addresses how Yates' lack of knowledge destroys Dominguez's cat's paw theory, such theory fails for additional reasons described *infra*.

Dominguez's protected activity, of which neither of them had knowledge, or of protected activity even generally.

Further, the cases cited by Dominguez were properly distinguished from the present facts by the District Court. Appx. Vol. II at 485-486, Order on Summary Judgment. In *Enstrom v. Beech Aircraft Corp.*, 712 F. Supp. 841, 849 (D. Kan. 1989), the court concluded the decisionmaker could have inferred that the plaintiff refused to make a statement in favor of the company for an ongoing EEOC investigation into another employee when he was involved in settlement negotiations related to that investigation, and further "exhibited considerable animosity against Plaintiff." In *Anderson v. Phillips Petroleum Co.*, 861 F.2d 631 (10th Cir. 1988), the evidence revealed that the individual with knowledge of the plaintiff's protected activity had a practice of communicating such information to the decisionmaker. In contrast to *Enstrom* and *Phillips Petroleum Co.*, Dominguez relies solely on Yates and Strickland's "close communication"—he does not identify any other situation in which Yates or Strickland could have learned about his protected activity, nor does he offer evidence that this is something that would typically be communicated between Yates and Strickland. Dominguez's offering is insufficient. *See Armstrong v. The Arcanum Grp., Inc.*, 897 F.3d 1283, 1287–88 (10th Cir. 2018) (explaining non-moving party cannot speculate knowledge by mere discussion of normal business).

In this same vein, Dominguez is mistaken in his argument that the *opportunity* for a decisionmaker to learn of a plaintiff's protected activity is alone sufficient to survive summary judgment. In *Lindsay v. Denver Public Schools*, 88 F.4th 1323 (10th Cir. 2023), this Court affirmed summary judgment for an employer, rejecting the appellant's contention that frequent meetings between the decisionmaker and an individual with knowledge of the appellant's protected activity created a fact issue, particularly when the parties to the meetings denied that the individual with knowledge ever disclosed such information. Weiser concedes that sworn testimony denying knowledge is not dispositive, but similar to the plaintiff in *Lindsay*, Dominguez has offered only speculation that the decisionmaker had knowledge of his protected activity—and it is the appellant who "has the burden of proving that those who acted against [him] had knowledge of [his] protected activity." *Lindsay*, 88 F.4th 1323 at 1328-29 (10th Cir. 2023); *see also Wickman v. Henderson*, 19 F. App'x 740, 742–43 (10th Cir. 2001) (where supervisors testified that they were unaware of plaintiff's protected activity before firing her, judgment as a matter of law for the defendant was appropriate despite evidence that the supervisors had met with someone who did have knowledge of the protected activity); *Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1054 (11th Cir. 2020) (in Title VII retaliation case, "[t]he meeting between [an employee with knowledge of protected activity] and [supervisor] is not itself evidence of [supervisor's] knowledge. Without more[,]

37

... evidence of [the employee's] opportunity to tell is not a substitute for evidence that she did so."); *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 257–58 (5th Cir. 2009) (court rejected as too speculative the argument by plaintiff that the supervisor who fired him was aware of his EEOC filings; plaintiff had pointed out that managers generally were made aware of EEOC filings by employees they supervise and that his supervisor had discussed his potential firing with the railroad's director of labor relations).

Ultimately, Dominguez must have more than pure speculation. *See, e.g., Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014). The District Court properly concluded that, without evidence that would allow a jury to infer that Yates or Strickland had knowledge of Dominguez's protected activity, Dominguez is unable to establish the causation required to present a *prima facie* claim of retaliation.

iv.     **Dominguez's "actual knowledge" argument is a thinly veiled ploy to improperly introduce legal theories he has waived.**

Cleary, the knowledge of Mr. Strickland or Mr. Yates regarding Dominguez's protected activity is a critical element of Dominguez's *prima facie* case. Dominguez tries to circumvent the requirement of knowledge by arguing that the District Court incorrectly assessed the standard of such knowledge, erroneously requiring proof of

"actual knowledge" rather than accepting Yates' alleged "belief" as sufficient.[12] App. Br. at 40. As an initial matter, this argument is meritless. The cases to which Dominguez cites for support—*Heffernan v. City of Paterson, N.J.*, 578 U.S. 266 (2016) and *Reich v. Hoy Shoe Co., Inc.*, 32 F.3d 361 (8th Cir. 1994)—involved situations where retaliation was based on the mistaken belief that a plaintiff had engaged in a protected activity when they had not. There is no application of the "mistaken belief" theory to these facts.

Regardless, whether it is applicable is irrelevant, because despite Dominguez's characterization of this argument as a question of "actual knowledge," it is in fact an attempt by Dominguez to introduce a pre-emptive retaliation theory— an argument that was not timely raised and was properly rejected by the District Court.

Dominguez claims that the District Court did not properly take into account evidence that Yates believed Dominguez engaged in a protected activity, but then abruptly switches course and argues that by referencing Yates' alleged belief, it was also preserving the pre-emptive retaliation theory. App. Br. at 41-42. As an initial matter, the notion of *pre-emptive* retaliation similarly makes no sense where, as here, it is undisputed that the protected activity had already occurred. Dominguez clearly

---

[12] Just as there is no evidence that Yates had knowledge of Dominguez's protected activity, there is also no evidence that Yates had a *belief* that Dominguez engaged in a protected activity.

engaged in a protected activity, which means the alleged retaliator would not be acting based on a fear or suspicion of something yet to happen, but in response the protected activity which had already taken place. It appears that, faced with the failure of his *prima facie* case at summary judgment—specifically due to the lack of evidence that the decisionmaker knew about the protected activity—Dominguez is now reaching for an alternate theory that is illogical in the context of his own allegations.

But more importantly, the District Court properly rejected Dominguez's attempt to raise this theory for the first time in his Motion to Reconsider. As noted by the District Court, "a motion to alter or amend cannot be used to raise new issues for the first time after entry of summary judgment." Appx. Vol. III at 516, n. 3, Order on Motion to Alter or Amend Judgment, (quoting *All W. Pet Supply Co. v. Hill's Pet Prods. Div., Colgate-Palmolive Co.*, 847 F. Supp 858 (D. Kan.. 1994)). Simply put, a footnote discussing the alleged belief of Yates that Dominguez had made a complaint to Sutherlin in the course of his June 10 meeting is insufficient to preserve an entirely distinct legal theory of pre-emptive retaliation.

## B. **THE DISTRICT COURT'S CAUSATION ANALYSIS WAS NOT ERRONEOUS.**

### i.     **The District Court properly applied the standard for summary judgment.**

Next, Dominguez essentially argues that the District Court failed to properly apply the summary judgment standard by not drawing inferences against the moving party. While Weiser contends that the District Court properly applied the summary judgment standard and viewed the facts in the light most favorable to Dominguez, "[b]ecause [this Court's] review is de novo, [it] need not separately address Plaintiff's argument that the district court erred by viewing evidence in the light most favorable to the [defendant] and by treating disputed issues of fact as undisputed." *Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 920 (10th Cir. 2004). This Court may affirm the District Court's grant of summary judgment on any basis the record supports, even one the District Court did not rely upon. *Davis v. Simon Prop. Grp.*, 9 F.App'x 876 (10th Cir. 2001).

Rather than misapplying the summary judgment standard, the District Court explained throughout the entirety of the Order granting Weiser's motion for summary judgment that the District Court was taking the evidence in the light most favorable to Dominguez. The District Court's grant of judgment to Weiser was not because of a misapplication of the law or the summary judgment standard but because Dominguez's claims lack merit. In particular, Dominguez alleges the

41

District Court failed to consider several pieces of evidence of the non-movant and also failed to draw reasonable inferences in favor of the non-moving party. This is incorrect.

First, Dominguez contends that the court drew an erroneous inference against the non-moving party when it "did not believe that Yates' communications to Strickland falsely reporting performance issues gave any indication that he was likely to share his beliefs about Dominguez's involvement in the investigation." App. Br. at 34-35. As discussed, Dominguez's contention that Yates "believed" Dominguez engaged in a protected activity is unsupported by the record. Dominguez then asked the District Court to inappropriately build on that pure speculation and additionally infer that, because Yates communicated issues with Dominguez's performance to Strickland, he would have also been "likely to share" his belief that Dominguez made a complaint of gender discrimination about Yates. *Id*. The District Court correctly rejected this chain of inferences.

Dominguez then refers to two alleged conversations between Dominguez and Yates that occurred *before* Dominguez met with Sutherlin and made his complaint. The only other evidence cited by Dominguez in support of this proposition was that Yates allegedly "focused on blaming Dominguez for the bulk of the issues" during his interview with Sutherlin. But the District Court's omission of this fact is immaterial and does not evidence a failure to credit the evidence of the nonmovant.

42

Whether Yates discussed with Sutherlin the ongoing tension between himself and Dominguez, which pre-dated Dominguez's protected activity, does not indicate that Yates had any knowledge of Dominguez's protected activity, nor that he would have been "likely to share" this information with the decisionmaker, Strickland.

Second, Dominguez argues that the District Court "appeared to infer that because there were no repercussions to Dominguez after his first report of sexual favoritism by Yates, no inference of hostility could be drawn from the second report." App. Br. at 34-35. Dominguez focuses his argument on how Yates was on leave during Dominguez's first complaint, and "that [Yates] did not seek retaliation at that time does not suggest he would not seek retaliation when he returned. . . ." *Id*. at 36. But the District Court's Order contemplated how the award following Dominguez's first complaint suggests there was no hostility harbored by *Strickland*—not Yates. Appx. Vol. III at 486-487. More specifically, the District Court inferred that there was no hostility toward Dominguez by Strickland for making a complaint about Yates because following Dominguez's 2020 complaint to Strickland about Yates, Dominguez received the "officer of the month" award and additional responsibilities. *Id*. To infer otherwise would have been an unreasonable inference in favor of the non-moving party.

Third, the District Court did not erroneously draw inferences in favor of the moving party when it rejected Dominguez's argument that, based on Yates' angry

43

phone call to Dominguez, a jury could infer that Yates knew about Dominguez's complaint. While Dominguez claimed that "whatever [he] said in the interview" was the reason for Yates' anger, it is undisputed fact that Yates called Dominguez to complain that his guards had not been properly trained. App. Br. at 37; UF 29. To reiterate, Yates had no knowledge of Dominguez's complaint to Sutherlin. Yates had not met with Sutherlin himself when this phone call occurred, thus Sutherlin had no opportunity to share Dominguez's complaint with Yates, and Sutherlin denies ever doing so. Further, even if Dominguez saw this phone call as him being "mistreated" or "singled [] out", this is insufficient for the court to infer that Yates had knowledge of Dominguez's protected activity. *See Lindsay v. Denver Pub. Schools*, 88 F.4th 1323, 1329 (10th Cir. 2023) (where mistreatment of the plaintiff was "not unique", it would be "unreasonable to make the inferential leap that the rudeness to [plaintiff] must have been based on knowledge of protected activity."). Tension between Dominguez and Yates was in fact, not unique; it was an ongoing issue predating Dominguez's protected activity, as discussed more thoroughly *infra*.

Fourth, Dominguez once again attempts to rely on the actions of Yates *before* Dominguez made his complaint to Sutherlin to somehow evidence retaliatory animus by Yates for the yet-to-have-occurred complaint. Appellant argues that these pre-report actions can be viewed as "indicating how Yates would react if Dominguez participated in the investigation." App. Br. at 37. It is unclear what Dominguez

44

means by this, and why such information would be relevant to whether Yates knew of Dominguez's protected activity or would have been likely to share any such knowledge with Strickland.

Finally, it was not erroneous of the District Court to refer to the "ongoing tension" between Dominguez and Yates as argued in Dominguez's brief. App. Br. at 37-38. Such tension is apparent in the record and detailed in the District Court's order. Appellant claims that the District Court made the "assumption that there were problems that existed other than Yates' concerns about reports against him." *Id*. But, for example, it is undisputed that on or around June 2—which is before the date Appellant claims Yates learned of any complaint against him—Yates and Appellant had a conversation wherein Yates said the two of them "had to get aligned" and "had to start working together, because if [they] weren't going to work together it was going to be either [Appellant's] job or [Yates'] job." Appellant wants to use this conversation as proof of retaliatory intent by Yates, despite it occurring *before* Appellant's protected activity. In truth, it supports the District Court's conclusion that the evidence indeed "paints a picture of ongoing tension between Appellant and Yates"—not, as Appellant contends, that Yates knew about Dominguez's protected activity. Appx. Vol. III at 489.

**ii.     The District Court properly declined to address Dominguez's evidence of pretext.**

Dominguez next argues that the District Court erred by refusing to consider Dominguez's evidence of pretext in deciding the third prong of his *prima facie* case. This argument misapprehends the well-established *McDonnell Douglas* burden-shifting framework and the specific guidance from this Court.

Under the *McDonnell Douglas* framework, a plaintiff must first establish a *prima facie* case of retaliation. Only if the plaintiff succeeds in establishing a *prima facie* case does the burden shift to the employer to articulate a legitimate, non-retaliatory reason for the adverse action. If the employer does so, the burden then shifts back to the plaintiff to demonstrate that the employer's stated reason is merely a pretext for retaliation. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973).

The District Court correctly concluded that because Dominguez failed to establish a *prima facie* case, it was not required to address his evidence of pretext. Appx. Vol. III at 492. As the District Court noted, citing *Nealis v. CoxCom, LLC, 731 F. App'x 787, 791 n.2 (10th Cir. 2018)*, "[C]ourts must not conflate evidence tending to cast doubt on the employer's stated reasons for an employment decision with the plaintiff's prima facie burden of establishing an inference of retaliation in the first instance." This principle is further elaborated in the *Nealis* footnote, which states:

Although this court has sometimes acknowledged that pretext evidence can be considered when assessing whether the employee has established a prima facie case when that evidence indeed gives rise to an inference of actionable discriminatory intent, see *Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1218 (10th Cir. 2003), we have also made clear that **plaintiffs must still produce sufficient probative evidence to establish their prima facie case**, see *Barlow v. C.R. England, Inc.*, 703 F.3d 497, 505 (10th Cir. 2012) ("If the plaintiff does not establish a prima facie case, [her] entire case fails."). We have also held that courts must not conflate evidence tending to cast doubt on the employer's stated reasons for an employment decision with the plaintiff's prima facie burden of establishing an inference of retaliation in the first instance. *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1144 (10th Cir. 2008) (holding that plaintiffs may not "gain the benefit of [an] inference [of retaliatory intent] without having to establish it," and a plaintiff hoping to prove her prima facie case by attacking the employer's reason for his termination must still show "a demonstrable nexus between aspersions cast on an employer's stated reasons and invidious intent.").

*Nealis*, 731 F. App'x at 791 n.2.

Indeed, the *Nealis* decision draws from this Court's precedent in *Adamson*, in which this Court addressed the lower court's decision to "presume the existence of a prima facie case in order to rule definitively on the issue of pretext." This Court stated:

While we recognize the utility of such an approach in this particular case, where evidence casting doubt as to the merit of the employer's proffered reasons is scarce, we cannot endorse it as a general matter. Requiring employers to engage in costly discovery to refute an inference of "discrimination" that is not otherwise actionable is both inefficient and unjust.

*Adamson*, 514 F.3d 1136 at 1148.

47

This authority clearly indicates that while pretext evidence *can* be relevant at the *prima facie* stage, it is only so if it itself gives rise to an inference of actionable discriminatory intent *and* directly helps establish an element of the *prima facie* case. Here, the missing element is Yates' knowledge of Dominguez's *protected activity*. Even if the alleged "trigger" for termination (failure to attend the Saturday training) was "made up," as Dominguez contends, this evidence of pretext does not, by itself, establish that Yates knew Dominguez engaged in protected activity. The "demonstrable nexus" required by *Adamson* is between the fabricated reason and *invidious intent* related to *protected conduct*. Without evidence that Yates knew Dominguez engaged in protected activity, any alleged fabrication of the reason for termination does not fill this crucial gap in the *prima facie* case. As such, the District Court correctly recognized that evidence challenging the employer's stated reason does not automatically satisfy the plaintiff's initial burden to show that the decisionmaker knew of the protected activity. Thus, it was not improper for the District Court to decline to consider Dominguez's evidence of pretext where it did not overcome the deficiencies of Dominguez's *prima facie* case.

### D.    DOMINGUEZ'S CAT'S PAW THEORY FAILS.

To make out a cat's paw theory, Dominguez must show that Yates was motivated by retaliatory animus, that Yates intended for him to be terminated, and that Yates' actions proximately caused the intended adverse employment action.

*Singh v. Cordle*, 936 F.3d 1022, 1038 (10th Cir. 2019). First, the District Court was correct that Dominguez's cat's paw theory fails when there is insufficient evidence to infer that Yates had any knowledge whatsoever that Dominguez engaged in a protected activity. Second, even if Yates had knowledge of Dominguez's protected activity, the undisputed facts show that Dominguez's termination was not proximately caused by Yates.

> i. **The District Court properly concluded that there can be no cat's paw theory without evidence that Yates knew of Dominguez's protected activity.**

First, the District Court was correct in determining that without Yates having knowledge of Dominguez's protected activity, he could not have had retaliatory animus toward Dominguez for such protected activity. Dominguez cites to three pieces of evidence that he argues creates a fact-issue on this point. None are persuasive.

Dominguez argues that the "get aligned" conversation occurring *before* Dominguez's complaint to Sutherlin was a "threat against cooperating in the investigation [of the race discrimination complaint by Culbertson]." App. Br. at 43. This is despite Dominguez's concession that no complaints, nor any allegations of discrimination were discussed in this conversation. It is further unclear how this

49

would create a fact issue on whether Yates knew that Dominguez made a complaint to Sutherlin *at a later date*.

Second, Dominguez again emphasizes the alleged importance of the angry phone call from Yates to Dominguez after Dominguez's meeting with Sutherlin, in which it is undisputed that Yates called Dominguez and complained about his guards not being properly trained as instructed for Dominguez to do. Appellant argues that it could "be reasonably viewed as anger over that fact that Dominguez had consented to be interviewed [in the investigation of Culbertson's complaint]." *Id*. But Dominguez must show evidence that would allow a jury to infer Yates' knowledge of Dominguez's *protected activity*, not just Yates' knowledge that Dominguez participated in an internal investigation of a complaint brought by another employee, as discussed more thoroughly *supra*.

Finally, Appellant argues that Yates not telling Dominguez to report for the Saturday training "indicates the kind of mendacity equating to retaliatory animus." *Id*. at 43. But just like the other instances referenced by Dominguez, this act could not have been retaliatory if, as is the case, Yates did not know about Dominguez's protected activity. The District Court accepted as undisputed fact that Dominguez was not told to attend this training—but there is nothing to suggest that that was because of his protected activity, rather than the result of the obvious incompatible working relationship between Dominguez and Yates. The District Court correctly

50

concluded that this evidence is insufficient for a factfinder to infer that Yates knew of Dominguez's protected activity, which is fatal to his cat's paw theory.

###### ii. The record shows that Yates did not proximately cause Dominguez's termination.

Even if Yates had knowledge of Dominguez's protected activity—which, to be clear, there is no evidence to support an inference that he did—Dominguez's cat's paw theory nonetheless fails as Yates' actions did not proximately cause Dominguez's termination.

First, Strickland testified that he made the termination decision independently after the client, not Yates, requested Dominguez's termination. UF 50–51 (Appx. Vol I at 030). No document or other evidence indicates that Yates ever requested or recommended that Dominguez be terminated. Dominguez testified that he had no evidence and indeed did not know if Yates was involved in the termination decision. *See* Appx. Vol. I at 090, Pl. Dep. 161:15-19 ("Honestly, I don't know who was involved in the termination decision…").

To succeed on a cat's paw theory, Dominguez must show more than Yates' "influence" or "input" into the decision; Yates must be the cause of the termination. *E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles,* 450 F.3d 476, 487 (10th Cir. 2006); *see also Singh v. Cordle*, 936 F.3d 1022, 1039 (10th Cir. 2019) ("[S]howing that [the decisionmaker] took [the alleged bad actor]'s recommendation into account does not necessarily mean that [the alleged bad actor] was the proximate

51

cause of the adverse action."). Even assuming that Yates intended to cause Dominguez's termination by relaying to Strickland that Dominguez was told to attend the Saturday training, there is no evidence that this was the cause of Dominguez's termination. Rather, it was Chip Ford, the client representative—whom Dominguez was tasked with keeping happy—who expressed to Strickland that "he was very upset that the Weiser security guards on site had not been sufficiently trained" and that he was similarly unhappy with Plaintiff's failure to wear a mask and promptly report his COVID-19 exposure. Appx. Vol. I at 047-048, Strickland Dec. ¶ 4, ¶ 8; *see also* Lee-Sutherlin Notes, Appx. Vol. I at 148. This evidence breaks the causal chain that is necessary for Dominguez to show a cat's paw theory of retaliation. *See Thompson v. Little am. Hotel Co.*, No. 22-4006, 2022 WL 10832885, at *6 (10th Cir. Oct. 19, 2022) ("[P]laintiffs cannot rely on the cat's paw theory of liability when an unbiased third party independently reviews an employee's performance and makes the decision to terminate her employment."); *Singh*, 936 F.3d at 1038–39 (discussing breaks in causal chain by employer); *Lobato v. New Mexico Env't Dep't*, 733 F.3d 1283, 1294–96 (10th Cir. 2013) (same).

Dominguez is essentially asking this Court to improperly second guess Weiser's business judgment, of which this Court repeatedly holds it will not do. *See, e.g., Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1233 (10th Cir. 2000). In analyzing employment decisions in the context of cat's paw, this Court has

52

"underscore[d] that it is the independence of the investigation that is at issue here; it is not our role to judge whether [the decisionmaker's] investigation was optimal—in its scope or components—or whether it arrived at the right conclusion." *Iweha v. State of Kansas*, 121 F.4th 1208, 1231 (10th Cir. 2024) (citing *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 10th Cir. 2007). This Court will not "ask whether the employer's reasons were wise, fair or correct; the relevant inquiry is whether the employer honestly believed its reasons and acted in good faith upon them." *Riggs*, 497 F.3d at 118-19. Strickland, upon receiving negative information about Dominguez from both Yates, and more importantly, the Client, made the independent decision to terminate Dominguez. As such, there is insufficient evidence to show that Yates was the proximate cause of Dominguez's termination.

## VI.    <u>REQUEST FOR RELIEF</u>

Weiser respectfully requests affirmation of the District Court's order granting it summary judgment and all other relief to which Weiser may be entitled.

## VII.    <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Pursuant to Fed. R. App. P. 34(a)(1), Weiser does not request oral argument. Weiser does not believe there are unique circumstances in this case that warrant oral argument.

/s/ *Nathan L. Whatley*
Nathan L. Whatley, OBA #14601
MCAFEE & TAFT
A PROFESSIONAL CORPORATION
Eighth Floor, Two Leadership Square
211 North Robinson
Oklahoma City, OK 731020-7103
Telephone: (405) 235-9621
Facsimile: (405) 235-0439
nathan.whatley@mcafeetaft.com

**ATTORNEY FOR THE APPELLEE**

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned certified that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B).

1.      Exclusive of the exempted portions in Fed. R. App. P. 32(a)(7)(B)(iii), this brief contained 12,614 words.

2.      This brief has been prepared in proportionally spaced typeface using Microsoft® Word 2019 in Times New Roman typeface, 14-point font for text and 14-point font for footnotes.

## CERTIFICATION OF DIGITAL SUBMISSION

Pursuant to the October 20, 2004, Tenth Circuit Emergency General Order, as amended, the undersigned certifies that:

1.      All required privacy relations have been made and, with the exception of those redactions

2.      Every document submitted in digital form is an exact copy of the written document filed with the Clerk.

3.      The ECF submission of this document was scanned for viruses with the most recent version of a commercial virus scanning program, Windows Defender Antivirus, Security Intelligence Version 1.433.177.0, which was updated on July 30, 2025, and, according to the program is free of viruses.

## CERTIFICATE OF SERVICE

I hereby certify that on this 1ˢᵗ day of August, 2025, I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing. Based on the records currently on file, the Clerk of the Court will transmit a Notice of Electronic Filing to the following ECF registrants:

**Mark Hammons**
**Amber Hurst**
HAMMONS, HURST & ASSOCIATES
325 Dean A. McGee Ave.
Oklahoma City, OK 73102
Telephone:   (405) 235-6100
Facsimile:    (405) 235-6111
Email: assistant@hammonslaw.com

**ATTORNEYS FOR PLAINTIFF/APPELLANT**

*/s/ Nathan L. Whatley*
Nathan L. Whatley

56